UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MYAH EVERS SCHWARTZ,<br><br>              Plaintiff,<br><br>    v.<br><br>UNUM LIFE INSURANCE COMPANY<br>OF AMERICA,<br><br>              Defendant. | Case No.  24-cv-02444-TSH<br><br>**ORDER RE: CROSS-MOTIONS FOR JUDGMENT**<br><br>Re: Dkt. Nos. 27, 28 |

## I.    INTRODUCTION

Plaintiff Myah Evers Schwartz brings this case against Defendant Unum Life Insurance Company of America to recover long-term disability benefits under a policy issued by Unum and governed by the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001–1461.  Pending before the Court are the parties' cross-motions for judgment pursuant to Federal Rule of Civil Procedure 52.  ECF Nos. 27, 28.  This Order comprises the findings of fact and conclusions of law required by Federal Rule of Civil Procedure 52(a).[1]  The Court finds this matter suitable for disposition without oral argument and **VACATES** the July 3, 2025 hearing.  Civ. L.R. 7-1(b).  Having considered the totality of the evidence in the record, the Court concludes that Schwartz has met her burden of demonstrating disability under the Plan.  Accordingly, the Court **GRANTS** Schwartz's motion and **DENIES** Unum's motion.[2]

_____

[1] To the extent that any conclusions of law are inadvertently labeled as findings of fact (or vice versa), the findings and conclusions shall be considered "in [their] true light, regardless of the label that the . . . court may have placed on [them]."  *Tri-Tron Int'l v. Velto*, 525 F.2d 432, 435 (9th Cir. 1975).

[2]  The parties consent to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c).  ECF Nos. 5, 17.

United States District Court<br>Northern District of California

## II.   LEGAL STANDARD

"In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a)(1). Where, as here, the parties request that "this matter be resolved through dispositive cross-motions under Rule 52," *see* ECF No. 18 ¶ 15, the court essentially conducts "a bench trial 'on the papers.'" *Kieserman v. Unum Life Ins. Co.*, 574 F. Supp. 3d 896, 900 (W.D. Wash. 2021) (quoting *Muller v. First Unum Life Ins. Co.*, 341 F.3d 119, 124 (2d. Cir. 2003)). That is, the court will ask "not whether there is a genuine issue of material fact, but instead whether [the claimant] is disabled within the terms of the policy." *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1094–95 (9th Cir. 1999); *McCulloch v. Hartford Life & Accident Ins. Co.*, 2020 WL 7711257, at *7 (N.D. Cal. Dec. 29, 2020) (In resolving Rule 52 motions, "the Court conducts what is essentially a bench trial on the record, evaluating the persuasiveness of conflicting testimony and deciding which is more likely true.") (citing *Kearney*, 175 F.3d at 1094–95).

## III.   FINDINGS OF FACT

### A.   Schwartz's Work Experience

Schwartz is a 47-year-old woman who has a bachelor's degree in English from Tufts University (1999) and a Master of Business Administration degree from the University of California at Berkeley Haas School of Business (2008). AR 77, 2374-75, 3976-77. She has experience in digital marketing and program management, having worked as a digital marketing manager at Vigilent, a director of content and marketing at WeMakeItSafer, head of digital for Concert Across America to End Gun Violence, and most recently at Workday as an Experience Marketing Operations Manager. AR 77, 2374-75, 3976-77.

Schwartz began at Workday as an intern in 2018 and was hired full-time on February 3, 2020. AR 5, 77. Her job as Experience Marketing Operations Manager required "strong communication and collaboration skills to work across the organization." AR 1652. It involved program management and marketing skills, flexibility in "a fast-paced setting with competing and ever-changing tasks," a "strong work ethic," resourcefulness, strong communications skills, excellent computer and technology skills, "high levels of tact and diplomacy," and "ability to drive

2

deadlines."  AR 1652-53, 77-78.

**B.      The Policy**

Workday has a long-term disability (LTD) benefit plan for its eligible employees, governed by ERISA.  AR 4230-74.  Workday's LTD plan is insured by a group policy (the Policy) issued by Unum.  *Id.*  The Policy allows for two distinct periods of disability: The "Usual Occupation" period that applies for the first 24 months of benefit payments, and the "Any Occupation" period after disability benefits have been paid for 24 months.  AR 4246.  Schwartz's claim was decided under the "Usual Occupation" definition of total Disability which states, in pertinent part, as follows: "you are totally disabled when, as a result of sickness or injury, you are unable to perform with reasonable continuity the substantial and material acts necessary to pursue your usual occupation in the usual and customary way."  *Id.*  The Policy's Elimination Period (the period after disability begins but before benefits are payable) is 180 days.  AR 4234.  The Policy provides that, to be eligible to receive benefits, "You must be continuously disabled through your elimination period."  AR 4246.  LTD coverage under the Policy ends "the last day you are in active employment."  AR 4244.

The Policy also provides that "[d]isabilities due solely to mental disorders are limited to a maximum pay period of 24 months."  AR 4252.  "Mental Disorder" is defined as "a psychiatric or psychological condition classified in the Diagnostic and Statistical Manual of Mental Health Disorders, published by the American Psychiatric Association, most current as of the start of a disability.  Such disorders include, but are not limited to, psychotic, emotional or behavioral disorders."  *Id.*

Workday terminated Schwartz's employment on November 1, 2021.  AR 80.  Based on the facts of Schwartz's claim, the parties do not dispute that the Policy's six-month elimination period ran from October 31, 2021 through April 30, 2022.  *See* Pl.'s Response to Def.'s Statement of Facts ¶ 7, ECF No. 33-1.

**C.      Schwartz's Medical History**

Schwartz began treating with her therapist, Licensed Clinical Social Worker Chantal Rohlfing, in March 2017.  AR 4096.  She began treating with her psychiatrist, Dr. Lucas Van

3

1    Dyke, in July 2015.  AR 87.

2        Shortly after starting in her role as Experience Marketing Operations Manager, Schwartz

3    began struggling at work.  AR 825; *see also* Pl.'s Response to Def.'s Statement of Facts ¶ 12.  In

4    May 2020 she told LCSW Rohlfing she "need[s] to set limits with manager who is giving her

5    work she doesn't have the time of inclination to do, partly because of the manager's style."  AR

6    825.  In June 2020 Schwartz discussed with LCSW Rohlfing her "concern that her boss does not

7    hold other people accountable for their work," and her "frustration with her boss's difficulty with

8    supervision and management skills."  AR 828, 831.  Schwartz similarly described her job

9    dissatisfaction to another therapist (Danielle Sheppard) as follows: "Supervisors seeing what she

10   can do and 'piling on more and more work,' too much to be able to complete and no guidance on

11   priorities of projects."  AR 734, 738.

12       Schwartz states that before the COVID-19 pandemic, she was able to manage her

13   symptoms of depression and anxiety and received validation and approval from her managers.  AR

14   78.  However, during the pandemic, she worked from home and felt "ineffective at managing kids

15   and trying to work during the day."  AR 836.  Schwartz states she was sleep-deprived, agitated,

16   overwhelmed by noise, felt overstimulated, and could not interact appropriately with her friends

17   and family.  AR 78, 2435.  She states her husband took over responsibility for the household

18   duties and caring for their children, as she had difficulty even leaving her home.  AR 78, 2435.  In

19   July 2020, Schwartz told LCSW Rohlfing she was "hopeful about possibility of hiring a caregiver

20   for kids and cousin, which might enable her to do her job," and added that she "feels guilty and

21   worried about [the] lack of work she's getting done, as kids interruptions are distracting to her."

22   AR 836.

23       In August 2020 Schwartz went out of work on short-term disability.  AR 12, 2435.  At that

24   time, she was unable to take care of her children or herself and stayed in bed most of the day.  AR

25   79.  She returned to work part-time (20 hours per week) on January 4, 2021.  AR 79, 2436.  When

26   she returned, she states she had difficulty controlling her emotions, was "unable to communicate

27   how to complete projects," and "could not prioritize or maintain thoughts in my head."  AR 79.

28   She also suffered from "uncontrolled rage" with her co-workers and family.  *Id.*  On March 11,

United States District Court
Northern District of California

4

2021, Schwartz stopped working again.  AR 79, 2436.  In May 2021 Schwartz told LCSW Rohlfing she was "considering applying for a writing position at her agency, which she feels might be a better match for her."  AR 895.

In July and August of 2021 Schwartz felt she was improving and had "small portions of the day when I could think about the future without breaking down and crying."  AR 80.  During this time, she underwent a neuropsychological evaluation with Gerard Chambers, Psy.D., Ph.D.  AR 628-33.  The evaluation showed "severe impairment" in sustained attention, impaired motor coordination and speed and "appreciable distress from uncontrolled mental health concerns," AR 629, 631.  Dr. Chambers noted that Schwartz suffered from "dysfunctional thinking" and "interpersonal issues" which included "social avoidance and social anxiety."  AR 631.  Dr. Chambers found Schwartz "diagnostically complex," and noted "some clinical correlation with an ASD [Autism Spectrum Disorder], pronounced double depression, and Cluster C personality malformation."  *Id.*  Dr. Chambers reported that test results revealed "a high average verbal intellect, low average perceptual reasoning, average working memory, and high average processing speed."  *Id.*  He found "her neuropsychological profile represents only the minimum of her capability in some cases.  There are indications of exaggeration-based symptom reporting due to appreciable distress from uncontrolled mental health concerns."  AR 629.  Dr. Chambers found that Schwartz displayed "a response style that suggests emotional distress which leads to problematic symptom reporting magnification," and that "[e]xaggeration and being self-critical was also indicated."  AR 631.  He concluded Schwartz "presents with a neuropsychological profile that is highly influenced by uncontrolled psychiatric symptomatology," and her strongest impairments were "[d]isruptions in fundamental cognitive functions such as attention, processing speed, motivation, and emotionality."  AR 632.

On August 23, 2021, Schwartz returned to Workday on a "job find" status in which she searched for another position within Workday.  AR 80, 2437.  Schwartz applied for the position of "Technical Writer," which required an entrance exam.  Pl.'s Response to Def.'s Statement of Facts ¶ 22.  In early September 2021 Schwartz told LCSW Rohlfing she was "anxious for taking the writing test tomorrow," and LCSW Rohlfing noted that Schwartz was "seeking a more appropriate

1    job for her needs." AR 910.  On September 8, right after she took the exam, Schwartz told LCSW

2    Rohlfing she "felt good about writing exam and celebrated over the weekend," but she "then felt

3    discouraged and depressed when she didn't hear from HR, and found she needed to wait a week to

4    have her writing exam reviewed." AR 911.  On September 15 she told LCSW Rohlfing she "feels

5    'rejected' by not passing writing exam to change jobs." AR 913.  During that same visit,

6    Schwartz told LCSW Rohlfing she was "trying to tell myself that I haven't studied writing, and

7    could learn how to pass the exam." AR 913.

8          On September 21, 2021, Dr. Van Dyke noted Schwartz "want[ed] to take classes on

9    profession or technical writing," but she "endorse[d] feeling demoralized and depressed.  She

10   endorses anhedonia and crying.  She reports considerable stress and rumination.  She reports

11   hopelessness." AR 1802-03.  Schwartz reported that "when she has a good manager, work has

12   helped her mental health." AR 1802.

13         On September 22, 2021, Schwartz told LCSW Rohlfing she "checked job listings at work

14   and decided there was nothing that would fit her skill set to apply for." AR 914.  LCSW Rohlfing

15   noted that both Dr. Van Dyke and Schwartz's husband encouraged her to take disability, and

16   Schwartz also discussed pursuing technical writing and taking classes in this field as an option.

17   *Id.*  On October 13 Schwartz told LCSW Rohlfing that her husband was unemployed, and she was

18   "anxious about finances if he doesn't seek work soon." AR 919.  On October 27 she told LCSW

19   Rohlfing she was "feeling depressed and anxious about upcoming termination meeting on 11/1

20   with workplace, and disability forms she needs psychiatrist to fill out by then." AR 921.

21         On October 29, 2021, Dr. Van Dyke completed an Attending Physician Statement as part

22   of Schwartz's short term disability claim.  AR 999-1001.  Dr. Van Dyke summarized his support

23   for Schwartz's disability claim as follows: "I have come to the conclusion that any form of work

24   causes [Schwartz] distress, depression and impairment." AR 1000.  Workday terminated

25   Schwartz's employment on November 1, 2021.  AR 80.

26         While Schwartz was employed at Workday, she also worked in various positions within

27   Mothership HackerMoms, a non-profit organization.  Pl.'s Response to Def.'s Statement of Facts ¶

28   55.  "Mothership HackerMoms is the first-ever women's creative life lab for mothers (broadly

United States District Court
Northern District of California

defined).  We make, we hack, we start businesses, we collaborate and commiserate, we fail together, and we grow together.  We were founded in April 2012 by and for creative mothers and our families.  HackerMoms has been widely covered in the press as a pioneer in the emerging family-based DIY culture." *Id.* ¶ 56.  Schwartz is the Chief Financial Officer and agent for service of process for the organization.  AR 2358; *see also* Def.'s Request for Judicial Notice, Exs. 1-2, ECF No. 29.[3]  Schwartz routinely referred to her activities at Mothership as "work" in her discussions with LCSW Rohlfing.  Pl.'s Response to Def.'s Statement of Facts ¶ 59.  In March 2022 Schwartz and LCSW Rohlfing "discussed [Schwartz's] desire to work for non-profit she's been a part of," and "[e]xplored options for proposals" for same.  AR 945.  In June 2022 Schwartz told LCSW Rohlfing about her "desire to publish writing she did on gun violence" and the fact that she was "doing work for her job" at Mothership.  AR 958-59.

In July 2022 Schwartz was "upbeat and pleased that 5 people attend[ed] open House of Mothership org, based on her outreach," and added that she would "get first paycheck soon."  AR 965.  She told LCSW Rohlfing she was "going to the office most days," and "has set up writing group and peer ASD group to continue, and is going on museum trip with women from nonprofit she works with."  AR 967.  In September 2022 Schwartz reported she "has been more active, and showing up to workplace even when tired," and added that she was "scheduling more social and work meetings, and notices how it helps her mood."  AR 974, 978.  In November 2022 Schwartz reported she "went to a party and got 'fired up' about writing" and discussed how she was

---

[3] Unum requests the Court take judicial notice of the following documents in connection with its Motion: "Exhibit 1: The Statement of Information filed on behalf of Mothership HackerMoms on May 23, 2023 with the California Secretary of State, signed by Plaintiff Myah Evers Schwartz" and "Exhibit 2: The Statement of Information filed on behalf of Mothership HackerMoms on February 5, 2024 with the California Secretary of State, signed by Plaintiff Myah Evers Schwartz."  Judicial notice of these statements is proper pursuant to Federal Rule of Evidence 201 because "they are matters of public record whose accuracy is not subject to reasonable dispute." *Motul S.A. v. USA Wholesale Lubricant, Inc.*, 686 F. Supp. 3d 900, 910 (N.D. Cal. 2023); *Theta Chi Fraternity, Inc. v. Leland Stanford Junior Univ.*, 212 F. Supp. 3d 816, 823 (N.D. Cal. 2016) (taking judicial notice of filings with the California Secretary of State because they are public record); *L'Garde, Inc. v. Raytheon Space & Airborne Sys.*, 805 F. Supp. 2d 932, 938 (C.D. Cal. 2011) (taking judicial notice of "records searches from the Secretary of State for the State of California corporate search website" because the accuracy of the documents "can be determined by readily accessible resources").  Accordingly, the Court **GRANTS** Unum's request and takes judicial notice of Exhibits 1 and 2.

"enjoying vacation with family" and "anxious about Monday work meeting," AR 819, 821.

**D.     LTD Benefits Claim**

In February 2023 Schwartz submitted her LTD claim, claiming she became disabled from performing the duties of an Experience Marketing Operations Manager due to anxiety, depression and atypical autism as of October 31, 2021.  AR 72-76.  Schwartz stated these conditions rendered her unable to perform her occupational duties due to "impairment of major life activities of social functioning and thinking."  AR 74.

**1.     Materials Submitted in Support of Claim**

In connection with her claim, Schwartz submitted medical records, declarations from herself and her husband, letters from LCSW Rohlfing and Dr. Van Dyke, and Dr. Chambers' report.  AR 777-986.

**a.     Declaration of Myah Evers Schwartz**

In her declaration, Schwartz stated she was taking daily anti-depressants, Fluoxetine and Bupropion XL, and had tried other prescriptions but they caused severe side effects.  AR 80. Schwartz stated she suffered from exhaustion, had difficulty interacting with her family and other people, and was only able to intermittently participate in household tasks such as laundry, cooking, and childcare.  AR 81-82.  She had "difficulty concentrating for long periods," second-guessed herself constantly, and unproductively dwelled on "countless scenarios of how people are going to react to things I've done or going to do."  AR 82.  Schwartz contrasted this experience with her prior job, in which she was "taking care of considerably more difficult financial and budgeting projects daily, was confident to meet deadlines and regularly exceeded expectations." She stated that she did not "feel like my brain thinks or does executive functioning at a level that would be needed for a job."  *Id.*

**b.     Declaration of Steve Schwartz**

In his declaration, Mr. Schwartz explained that he had known Schwartz since 1998 and had been married to her since 2002.  He stated she deteriorated when the COVID pandemic began and suffered from "worsening anxiety and depression," which "made it very difficult for [her] to function at her normal levels, both at work and with home life contributions."  AR 85.  Mr.

United States District Court
Northern District of California

1    Schwartz explained that before her illness Schwartz was "very excited about working" at

2    Workday, and "felt like she was having a significant impact on the team" by applying her past

3    project management experience. *Id*. Schwartz only took minimal time off when she had kids

4    "because she wanted to be back at work" and "would certainly want to work if she were medically

5    able." *Id*. However, she "has struggled with executive function skills in all aspects of her life and

6    it makes it very difficult for her to work at any level." *Id*.

### c.    Letter from Dr. Van Dyke

Dr. Van Dyke stated he had been treating Schwartz for major depressive disorder since July of 2015. AR 87. He opined Schwartz continued to "meet[] the criteria for long term disability based on the fact that we have tried many conventional and non-conventional treatments, provided time off from work, part-time work schedule, and work accommodations. However, despite all these interventions she consistently suffers high levels of depression, distress, and impaired functionality when she genuinely attempts to work." *Id*.

### d.    Dr. Chambers' NPE

Schwartz submitted Dr. Chambers' report, as summarized above. Schwartz also submitted a Reasonable Accommodation Questionnaire completed by Dr. Chambers on August 6, 2021. AR 507-08. Dr. Chambers assessed Schwartz's capability for returning to work as follows:

> Ms. Evers has a substantial impairment in the major life activities of thinking and social functioning. Her social limitations preclude her from operating in her current workgroup, because of the gravity of her social & social communication limitations that are unlikely to be remediated. Her current work team of experience marketing is filled with unpredictability and constant reprioritization of tasks which are a clear benefit to their working proficiency. However, while Ms. Evers respects this working environment, it is very difficult for her to read the social and social communicative climate long meetings, and she has challenges adjusting to hourly task changes, especially when they are ambiguous causing frequent feelings of being overwhelmed, which results in marked increases in anxiety and depression. Her substantial impairments in thinking are more likely to be temporary as new interventions are sought to reduce their impact on her fulltime work functioning. Her social impairments are permanent in nature and will require a more predictable workflow, the removal of frequent unpredictable changes, easier task prioritization, and less frequent changes to job duty expectations.

AR 508. Dr. Chambers stated that these restrictions were "permanent." *Id*.

9

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

### 2.    Unum Denies Schwartz's LTD Claim

Unum referred Schwartz's claim and supporting documents to Registered Nurse Kay O'Reilly, a Senior Clinical Consultant for Unum. AR 2433-43. In her May 11, 2023 report, RN O'Reilly noted Schwartz's depression and anxiety "has been present for several years" and she "has a history of work issues around communication." AR 2442. RN O'Reilly stated "[i]t appears her depression and anxiety worsened with the COVID pandemic," but she concluded there was "no support for functional loss" beyond a LTD benefit start date of April 28, 2022. *Id*. RN O'Reilly did not consider Schwartz's condition to be "significant" and stated that her mental status examinations were "generally normal, except for her reported mood." *Id*. RN O'Reilly also noted Schwartz was trying to remain active by exercising, taking trips, and being "active in a non-profit." *Id*.

On June 2, 2023, Unum in-house psychiatrist Dr. Stuart Shipko concluded that the "available information does not support that Ms. Schwartz is precluded from performing the full time demands of her occupation from 10/31/21 through 4/28/22 and beyond." AR 3110. Dr. Shipko stated that Schwartz's difficulties returning to work were because of "other factors" that "influenced Ms. Schwartz's work history," including "supervisory conflict." *Id*. He noted Schwartz had tried numerous medications, but he found it "inconsistent that, in a disabled patient, no additional medications or medical treatments are considered." *Id*. Dr. Shipko opined that Schwartz insufficiently attended doctor visits and was attempting to "figure[e] out her next career," "conceive of a plan for a job," and "make a proposal," all of which "reflect intact executive functioning." *Id*. He opined that her activities with Mothership showed she was capable of "social functioning" and "interpersonal ability." AR 3111.

Unum referred Schwartz's file for a "Designated Medical Officer (DMO)" review response by psychiatrist Dr. Mark Schroeder, which was completed on June 7, 2023. AR 3113-15. Dr. Schroeder concluded the record "did not document significant mental status abnormalities." AR 3115. He opined there was no "substantial disruption of normal daily activities," and that Schwartz was engaged in social activity that "raises questions about the severity of her claimed psychiatric impairment." *Id*. He also noted "exaggeration-based symptom reporting" in her exam

10

1    with Dr. Chambers, which "raises the question of whether the claimant's actual occupational

2    abilities are underestimated by her self-report."  *Id*.  He attributed Schwartz's issues to "work

3    turmoil," which "does not in itself constitute psychiatric impairment."  *Id.*

4          In a letter dated June 13, 2023, Unum determined Schwartz was not continuously disabled

5    through the 180-day elimination period (October 31, 2021 through April 30, 2022).  AR 3132-42.

6    In its letter, Unum stated "the information received does not support that [Schwartz] is precluded

7    from performing the full time functional demands of her usual occupation as noted below as of

8    March 15, 2022."  AR 3137.

9          **3.    Schwartz Appeals Unum's Denial**

10         Schwartz appealed through counsel on December 8, 2023.  AR 3249-3889.  With her

11   appeal, she provided updated medical records and an evaluation from vocational expert Ashley

12   Johnson, MS, CRC, CLCP, which was prepared on December 6, 2023.  AR 3599-3609.  Ms.

13   Johnson reviewed Schwartz's medical and employment records and concluded that her occupation

14   with Workday "required a great deal of multi-tasking and interpersonal interactions," as well as

15   "great attention to detail and complex problem solving."  AR 3606.  Ms. Johnson noted that

16   Unum's vocational experts stated that Schwartz's job involved "performing a variety of duties,

17   involving frequent changes of tasks involving different aptitudes, technologies, techniques,

18   procedures, working conditions, physical demands, or degrees of attentiveness," as well as

19   "making judgements and decisions, solving problems, making evaluations, and reaching

20   conclusions."  *Id*.  Ms. Johnson determined that "[a]ny occupation where her skills would transfer

21   would require similar mental demands.  Ms. Evers Schwartz's symptoms and limitations would

22   preclude her from being reliable and productive in any occupation."  *Id*.

23         Schwartz followed up on December 14, 2023 with updated records from LCSW Rohlfing

24   and an independent medical evaluation prepared by psychiatrist Dr. Brian P. Jacks dated

25   December 8, 2023.  AR 3967-97.  During her interview with Dr. Jacks, Schwartz stated she "is

26   constantly tired," could only "think and concentrate for ten minutes and then gets distracted," had

27   "very poor" memory, obsessed about people and events, and had difficulty making decisions.  AR

28   3972.  She stated "[s]he wished she were dead once a week," although she had no specific plan to

United States District Court
Northern District of California

hurt herself.  AR 3971.  Schwartz told Dr. Jacks "she had done technical writing for over twenty years" and did not pass the writing exam at Workday because "her brain was in a 'fog.'"  AR 3969.

Based on his psychological testing, Dr. Jacks noted Schwartz endorsed "excessive numbers of atypical rarely-given responses" during testing; however, he interpreted these results as "not malingering" but rather a reflection of "extreme emotional distress."  AR 3980, 3987.  A mental status examination showed "signs of significant emotional distress," including "becoming red faced, teary eyed, crying, long pauses, slowing down in her psychological, emotional, and cognitive responses."  AR 3986.  Beck Depression Inventory testing showed "extremely severe depression."  *Id.*  Dr. Jacks concluded that Schwartz "is experiencing moderate-to-severe emotional distress characterized by dysphoria, guilt, and anxiety."  AR 3981.  Dr. Jacks diagnosed Major Depressive Disorder, Moderate, Atypical Autism Disorder, Obstructive Sleep Apnea, and Rule Out Developmental Coordination Disorder.  AR 3984-85.  He stated Schwartz "has extreme difficulty . . . with social interactions.  She does not handle or understand ordinary social cues and has problems communicating with others or understanding visual social interactions beyond those of simple ones," and these difficulties caused her to "easily misinterpret" more detailed or complex social interactions, "causing her much anxiety and depression."  AR 3991.  Dr. Jacks concluded: "She is extremely distressed and has serious psychiatric problems."  AR 3992.  Regarding a potential return to work, Dr. Jacks stated:

> She is therefore mentally incapacitated from performing the necessary and critical aspects of her job as an events operations manager or other jobs even as a technical writer or any other jobs in the open labor market.  She has continued to unfortunately have consistent difficulties on a psychiatric basis from the period of time she has been off work from 11/01/2021 to the present and continuing.  Unfortunately, even with the psychiatric treatments and psychological treatments she has had, which have been extensive and multidisciplinary, these have not resulted in much improvement and are not likely to improve much therefore in the future.  She certainly qualifies for a total disability since 10/31/2021 to the present and continuing and in all reasonable medical probability, her emotional condition would be considered on a continuing basis permanently totally disabled from employment in the open labor market and/or specifically from the job that she had at Workday.

*Id.*

#### 4.      Unum Upholds its Denial Decision

Unum referred Schwartz's appeal to its in-house psychiatrist, Dr. Peter Brown.  AR 4013-16.  On January 19, 2024, Dr. Brown prepared a report in which he noted Schwartz had "a chronic complex psychiatric condition, possibly dating back to childhood, with treatment of depression without full resolution of symptoms dating back to early adulthood."  AR 4014.  However, he found "[r]estrictions and limitations are not supported through the timeframe in question."  *Id.*  Dr. Brown opined that any difficulties Schwartz had were "consistent with situational factors," and found that, overall, "the records are not consistent with severe and sustained psychiatric impairment during the timeframe in question."  *Id.*  Dr. Brown did not discuss Dr. Jacks's report because it "does not provide substantive additional information beyond that provided by the actual time relevant record."  AR 4016.  Unum sent this report to Schwartz, AR 4033, who responded on February 16, 2024 with additional letters from Dr. Jacks and Dr. Chambers.  AR 4048-59.

In his letter, Dr. Jacks questioned Dr. Brown's expertise, especially with regard to child and adolescent psychiatry, which Dr. Jacks emphasized was important given Ms. Schwartz's autism spectrum disorder diagnosis.  AR 4049-50.  Dr. Jacks noted "Dr. Brown has not done any face-to-face, in person direct interview of Myah Schwartz the way I did."  AR 4050 (emphasis omitted).  In his letter, Dr. Chambers stated: "There was no overt evidence of neurocognitive malingering during my exam," and it was his opinion "that her uncontrolled psychiatric symptoms caused her substantial impairments, and the aberrant neuropsychological scores from my examination reflected the magnitude of her disability status at the time of the exam and for at least another year, based on my review of records, informant reports, my knowledge of her state at the exam's conclusion, and her updated contact with me about the course of her mental illness."  AR 4056.

Unum sent this new information to its in-house psychologist, Dr. D. Malcolm Spica, who opined on February 27, 2024 that "the neuropsychological examination completed 2/1/23 appears invalid" because "performance validity indicators" were "reportedly subnormal."  AR 4067-68.  Dr. Spica opined that Dr. Jacks's testing was "invalid" due to "distorted self-presentation" indicating a "probability of symptom exaggeration."  AR 4067.  Dr. Spica concluded that

1    Schwartz's "performances are inconsistent with a debilitating neurocognitive disorder," and "to a

2    reasonable degree of professional certainty, no limitations or restrictions are supported on

3    neurocognitive bases." AR 4068. Dr. Spica stated: "Dr. Chambers did cite that the claimant's

4    psychological factors may be influencing her experience of cognitive dysfunction" and agreed

5    Schwartz "has a history of depression, anxiety, and Borderline Personality Disorder." *Id*. Dr.

6    Spica thus recommended that a behavioral health specialist review Schwartz's file to evaluate

7    issues beyond his "focused scope." *Id*.

8         Dr. Brown also reviewed the updated information and opined that Schwartz's testing was

9    "consistent with florid symptom exaggeration" and her "subjective reports are not reliable

10   indicators of her actual functional capacity and must be interpreted with appropriate clinical

11   caution." AR 4070-72. Dr. Brown agreed that Schwartz suffered from "a chronic complex

12   psychiatric condition," but stated her symptoms were "situational." *Id*.

13        Unum sent Dr. Spica's and Dr. Brown's reports to Schwartz. AR 4085-86. Schwartz

14   responded on March 18, 2024 with an updated letter from LCSW Rohlfing. AR 4095-97. LCSW

15   Rohlfing stated she had been treating Schwartz since 2017 and throughout that time Schwartz had

16   suffered from deficits in social communication and interaction and major depressive disorder. AR

17   4096. LCSW Rohlfing agreed with Dr. Brown that Schwartz had a "complex psychiatric

18   condition," but disagreed with his conclusion that she could work with that condition. *Id*. LCSW

19   Rohlfing noted Schwartz had tried to return to work multiple times, but her symptoms had

20   worsened every time. She opined that Schwartz's "symptoms have caused major impairment in

21   her ability to function at home and at work, difficulty managing and staying on task, poor

22   executive functioning and brain fog . . . . These symptoms persisted during the timeframe of

23   October 31, 2021, through April 28, 2022, and beyond." AR 4096-97. LCSW Rohlfing

24   "disagree[d] with Dr. Brown's assertion that [Schwartz] demonstrates 'florid symptom

25   exaggeration.' I have known her for several years and she is not a malingerer." AR 4097.

26        Unum upheld its denial decision in a letter dated March 28, 2024. AR 4142-50. In its

27   letter, Unum stated, "it was determined that Ms. Evers has the functional and cognitive capacity to

28   perform the substantial and material acts of her usual occupation (as noted above) through the

1    elimination period (from October 31, 2021 through April 28, 2022)."  AR 4146.

2        Unum denied Schwartz's claim during the Usual Occupation period and never evaluated

3    whether she is disabled under the Policy's Any Occupation definition of disability.  AR 4142-50;

4    Pl.'s Response to Def.'s Statement of Facts ¶ 7.

5                        **IV.    CONCLUSIONS OF LAW**

6    **A.    Legal Standard**

7        "Section 502 of ERISA entitles a participant or beneficiary of an ERISA-regulated plan to

8    bring a civil action to recover benefits due to him under the terms of his plan, to enforce his rights

9    under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."

10   *Chappel v. Lab. Corp. of Am.*, 232 F.3d 719, 724 (9th Cir. 2000) (quoting 29 U.S.C. § 1132

11   (a)(1)(B)).  A Plan administrator's decision to deny benefits is reviewed *de novo*, unless the Plan

12   provides the administrator with discretionary authority to determine eligibility for benefits or to

13   construe the terms of the plan.  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).

14   The parties agree the standard of review in this case is *de novo*.  Pl.'s Mot. at 15; Def.'s Mot. at

15   16.

16       Under a *de novo* standard of review, the Court performs "an independent and thorough

17   inspection" of the Plan administrator's decision to determine whether the Plan administrator

18   correctly or incorrectly denied benefits."  *Silver v. Exec. Car Leasing Long-Term Disability Plan*,

19   466 F.3d 727, 733 (9th Cir. 2006).  The Court may "evaluate the persuasiveness of conflicting

20   testimony and decide which is more likely true."  *Kearney*, 175 F.3d at 1095.  The claimant bears

21   the burden of proving, by a preponderance of the evidence, that she is entitled to benefits under the

22   Plan.  *Muniz v. Amec Const. Mgmt., Inc.*, 623 F.3d 1290, 1294 (9th Cir. 2010).  In other words, the

23   plaintiff has the burden to show her claim falls within the scope of coverage.  *Id*.  "Under the

24   federal common law of ERISA," courts "'interpret terms in ERISA insurance policies in an

25   ordinary and popular sense as would a person of average intelligence and experience.'"  *Padfield

26   v. AIG Life Ins. Co.*, 290 F.3d 1121, 1125 (9th Cir. 2002) (quoting *Babikian v. Paul Revere Life

27   Ins. Co.*, 63 F.3d 837, 840 (9th Cir. 1995)).

28       In conducting its *de novo* review, the Court gives no deference to Unum's decision.

1    Instead, the Court must evaluate the persuasiveness of each side's case and determine if Schwartz

2    has adequately established she is disabled under the Plan.  "As in this case, a claimant's treating

3    physician and the plan's hired medical expert often provide conflicting opinions and courts must

4    determine which opinion to credit.  ERISA does not provide district courts with guidance for

5    resolving such conflicts."  *Popovich v. Metro. Life Ins. Co.*, 281 F. Supp. 3d 993, 1003 (C.D. Cal.

6    2017).  In considering conflicting opinions, "ERISA does not require a plan administrator to

7    accord greater weight to a claimant's treating physician."  *Id.* (citation omitted); *Black & Decker*

8    *Disability Plan v. Nord*, 538 U.S. 822, 834 (2003) ("[I]f a consultant engaged by a plan may have

9    an 'incentive' to make a finding of 'not disabled,' so a treating physician, in a close case, may

10   favor a finding of 'disabled,' ... [therefore] courts have no warrant to require administrators

11   automatically to accord special weight to the opinions of a claimant's physician.").  "Rather, a

12   claimant must prove tha[t] his impairment is disabling, using objective and subjective medical

13   evidence in the record."  *Popovich*, 281 F. Supp. 3d at 1003 (citing *Seleine v. Fluor Corp. Long–*

14   *Term Disability Plan*, 598 F. Supp. 2d 1090, 1101–02 (C.D. Cal. 2009)).

15   **B.      Ability to Perform Duties at Workday**

16        Unum argues Schwartz cannot show a disability under the Policy because she was never

17   able to manage her duties and responsibilities as an Experience Marketing Operations Manager

18   after she was promoted to that position in February 2020.  Def.'s Mot. at 19; Def.'s Opp'n at 1.  It

19   argues this case is different than most lawsuits involving the denial of a claim for long-term

20   disability benefits because "[i]n most such cases, the claimant demonstrates that she is qualified

21   and capable of working in her occupation and establishes a baseline 'usual and customary way' of

22   performing the occupational duties before the period of alleged disability begins.  Plaintiff Myah

23   Evers Schwartz never did so."  Def.'s Opp'n at 1.

24        Schwartz's job at Workday required her to have high flexibility "with competing and ever-

25   changing tasks," "manage process, meeting and timelines," and drive "deadlines and

26   interdependencies."  AR 1652.  She was also in charge of researching and providing training

27   opportunities for her team.  AR 1653.  She was required to be a "[r]esourceful, self-starter that

28   works best in a team environment," with "strong communication skills and "high levels of tact and

diplomacy." *Id*. During her appeal, Schwartz and Unum debated how these job duties translated into a "Usual Occupation" under the Policy. *Compare* AR 1697 (April 20, 2023 vocational response and analysis by Unum concluding that under the eDOT, "the occupation in the local economy is Operations Manager") *with* AR 3602, 4057-58 (vocational evaluations by Ms. Johnson classifying Schwartz's occupation under the DOT as "Management Analyst").[4] However, the differences between the duties of these two occupations is not determinative, as both occupations are demanding and involve significant managerial skills, including organization, collaboration, solving problems, making judgments, extensive interpersonal relationships, frequent task changing, and attention to detail. AR 1697-98.

At the time she first stopped work, Schwartz found "[i]t was extremely difficult staying on task. It was difficult to communicate because my thoughts were so tied up with emotions. . . . I was constantly second-guessing myself" and "redoing work because I was afraid it was done wrong." AR 78. Schwartz states her thoughts were "foggy" and she "made decisions very slowly." *Id*. When she returned to work in January 2021, her abilities did not improve. She "could not concentrate," "[v]ery small tasks took inordinate amounts of time," she "could not comprehend instructions given to me," and she "felt unable to communicate how to complete projects and could not prioritize or maintain thoughts in my head." AR 79. By the time she was terminated, she "could not concentrate and spent long periods of time crying." She was "near-suicidal" and "barely left the house." AR 80. The Court finds these statements credible based on a review of the record.

LCSW Rohlfing informed Unum that Schwartz's symptoms have caused "major impairment" in her "ability to function at home and at work" as well as "difficulty managing and staying on task," and resulted in "poor executive functioning and brain fog." AR 793. Dr. Van Dyke opined Schwartz continued to "meet[] the criteria for long term disability based on the fact

---

[4] DOT stands for "Dictionary of Occupational Titles," a job classification resource published by the Department of Labor. eDOT stands for "Enhanced Dictionary of Occupational Titles," and is a proprietary non-public resource. *See Covill v. Unum Life Ins. Co. of Am.*, 2024 WL 3443916, at *16 (N.D. Iowa July 16, 2024), *report and recommendation adopted*, 2024 WL 4003523 (N.D. Iowa Aug. 30, 2024) (noting that Unum's use of the eDOT "creates a conundrum for the Court" because "the Court lacks access to the eDOT").

United States District Court
Northern District of California

1  that we have tried many conventional and non-conventional treatments, provided time off from

2  work, part-time work schedule, and work accommodations. However, despite all these

3  interventions she consistently suffers high levels of depression, distress, and impaired

4  functionality when she genuinely attempts to work." AR 87.

5      Unum contends "the challenges Schwartz faced at work and the events leading to her

6  termination from Workday were unrelated to a medical disability" and were in fact due to

7  "unhappiness" at work. Def.'s Mot. at 3-4. It asserts Schwartz was frustrated with her managers,

8  who were assigning work without adequate guidance, and "yearned to instead pursue a writing

9  career." *Id.*[5] It argues Schwartz "was never capable of adequately performing the duties of an

10  Experience Marketing Operations Manager." Def.'s Opp'n at 3. A review of the record does not

11  support Unum's argument. There is no testimony from anyone at Workday to that effect, and

12  Schwartz candidly admits throughout the record that her difficulty at work was not because of

13  inept supervision but because of her own personal battle with her mental illness. *See, e.g.*, AR 78

14  (Schwartz had "an increasingly difficult time at work" due to misunderstandings, irritability,

15  trouble communicating, second-guessing herself, and redoing work). Indeed, the record shows

16  that Workday continually attempted to accommodate Schwartz by granting her multiple leaves of

17  absence, reevaluating her position after Dr. Chambers' report, and bringing her back to work on a

18  "job find" status. *See, e.g.*, AR 876 (agreeing to limit Schwartz to one project at a time), AR 877

19  (boss "was accepting of her limits"), AR 883 (boss supported "taking more disability leave").

20  Unum also points to Schwartz's failure to pass the technical writing exam as evidence "she did not

21  have the necessary training/education" to succeed in her position. Def.'s Mot. at 5. However,

22  Schwartz has a B.A. in English from Tufts and an M.B.A. from Berkeley, and the record reflects

23

24  [5] Unum also contends Schwartz "told Dr. Gerard Chambers that she lost her job not because of a
disability, but because of her inability to get along with her manager." *Id.* at 4. But this is not
25  clear from the record. Dr. Chambers' report does not state that Schwartz was terminated at
Workday because of conflict with her manager; it only states her "occupational history is positive
26  for termination due to difficulty with a manager." AR 629. Dr. Chambers did not specifically
refer to Workday, and the placement of this comment within a larger discussion of Schwartz's
27  "background" and "employment history" as a whole suggests that this comment was not referring
to Workday. *See* AR 857 (therapy note in which Schwartz explained that she had been fired from
28  a previous job, but later offered her job back). As such, this argument is unavailing.

18

that "she had done technical writing for over twenty years."[6] AR 77, 3969.  As a result, it is unlikely that lack of education, training, or ability was to blame.

Unum argues: "Although Schwartz would later tell Unum and her treatment providers that she failed the test because of cognitive difficulties she attributed to mental health issues, that story is at odds with Schwartz's contemporaneous reports to Ms. Rohlfing," noting that after she took the exam, Schwartz told LCSW Rohlfing that she "felt good about writing exam and celebrated over the weekend."  Def.'s Mot. at 5 (quoting AR 911).  However, nothing in LCSW Rohlfing's notes contradicts Schwartz's statement.  Leading up to the exam, Schwartz felt "overwhelmed with anxiety and desire to retreat to bed," was tearful, and was "very depressed and anxious" with "self-critical thoughts that 'something's wrong with me.'"  AR 907-08, 910.  While she may have "felt good" about the exam immediately after taking it, she quickly "felt discouraged and depressed."  AR 911.  She was "depressed and occasionally tearful, saying 'I feel like giving up.'"  *Id*.  After Schwartz learned she failed the test, she reported that she felt "rejected" and that it brought up "past feelings of rejection and depression."  AR 913.  She was "anxious about meeting with HR tomorrow to go over timeline about finding another job and/or being on disability, and feels like she's lost perspective on her ability and lacks hope about getting any job."  *Id*.  Schwartz was "depressed and overwhelmed," and her "[h]usband and psychiatrist both encouraged her to take disability due to her stress level."  AR 914-15.  Schwartz's contemporary reports to her psychiatrist, Dr. Van Dyke, were similar.  *See* AR 1803 (she "endorses feeling demoralized and depressed.  She endorses anhedonia and crying.  She reports considerable stress and rumination. She reports hopelessness.").

In short, while the demanding nature of Schwartz's duties at Workday after her promotion surely did not help her in battling her illness, her problem was not, as Unum argues, that she was "unhappy working for a particular manager or dissatisfied with a particular job."  Def.'s Mot. at 10.  Regardless of her job situation, Schwartz's symptoms were sufficiently severe that her

---

[6] Unum contends this statement is in tension with her comments to LCSW Rohlfing and Dr. Van Dyke that she needed to improve her writing skills.  Def.'s Mot. at 13 (citing AR 913, 1803).  But the Court finds no contradiction, as one can simultaneously have technical writing skills yet still want to enhance them.

1    treatment providers agreed that her impairments disqualified her from working in the demanding

2    managerial occupation she held at Workday.  *See Macalou v. First Unum Life Ins. Co.*, 2024 WL

3    4867091, at \*19 (S.D.N.Y. Nov. 22, 2024) (plaintiff's mental illness symptoms "transcend her

4    'job situation,' and would likely be present in any high pressure work environment").

5    **C.     Schwartz's Credibility**

6           Schwartz argues she is unable to perform in the role because she is "severely debilitated

7    due to mental illness."  Pl.'s Mot. at 16.  According to Schwartz, when the COVID-19 pandemic

8    began, she began having increased difficulty communicating, interacting with others, focusing,

9    staying on task, and engaging in decision-making.  AR 78.  She withdrew from both her job duties

10   and her family, becoming increasingly unable to take care of herself or her own children.  AR 79.

11   She was "unable to communicate how to complete projects" and "could not prioritize or maintain

12   thoughts in my head."  *Id*.  Schwartz also lost emotional control, crying multiple times per day,

13   and felt alternately sad and enraged.  At her lowest points she "dreaded every minute of the day,"

14   and was "close to suicidal."  AR 79-80.  While the Court may consider these subjective reports,

15   they do not, on their own, establish disability under an ERISA plan.  *See, e.g., Bratton v. Metro.*

16   *Life Ins. Co.*, 439 F. Supp. 2d 1039, 1052 (C.D. Cal. 2006) ("A finding of disability based on mere

17   subjective complaints would open the Plan up to malingering and would greatly hamper [the

18   insurance company] from exercising its fiduciary role of scrutinizing requests for benefits");

19   *Seleine*, 598 F. Supp. 2d at 1102 ("Seleine's subjective complaints of pain . . . were subject to

20   verification by objective medical evidence.  [The administrator] was under no obligation to accept

21   them at face value"); *McCool v. Life Ins. Co. of N. Am.*, 2018 WL 6137163, \*5 (C.D. Cal. Nov. 9,

22   2018), *aff'd*, 842 F. App'x 164 (9th Cir. 2021) ("whether there is evidence of a disability, the court

23   looks to the objective medical evidence rather than relying solely on a claimant's subjective

24   reports of pain").

25          Unum argues Schwartz's "treatment notes are most remarkable for the absence of

26   abnormal findings or observations on mental status exams.  By and large, the relevant treatment

27   notes undermine Schwartz's assertion that she was cognitively or functionally impaired to a

28   degree that rendered her unable to perform her occupational duties."  Def.'s Mot. at 18.  As an

United States District Court
Northern District of California

20

example, Unum notes Schwartz states in her declaration that "[i]n October and November 2021, I was near suicidal" and "[thinking] about walking in front of cars," but in a treatment note dated October 13, 2021, LCSW Rohlfing described Schwartz's "mood" as "stable and hopeful," and two weeks later she noted "Ct. [client] has no suicidal ideation." *Id.* at 6 (citing AR 80, 919, 921). Unum also points to Dr. Van Dyke's treatment notes dated September 21, 2021 ("She denies SI [suicidal ideation]") and his Monitoring Report dated November 22, 2021 ("Current Suicidal thoughts: Not at all"). *Id.* (citing AR 1803, 1823). As another example, Unum points to Schwartz's statements that she is disabled due to cognitive impairment and that she experienced difficulties at Workday because she "was unable to follow all conversation and had brain fog." Def.'s Mot. at 7 (citing AR 74, 78-79). Unum contrasts this with LCSW Rohlfing's treatment notes from October 2021 through October 2022 in which she made the following observations: "Cognitive Functioning: Oriented / Alert"; "Interpersonal: Interactive"; "Functional Status: Intact." *Id.* (citing AR 917-83). Unum also points to Dr. Van Dyke's Mental Status Exam findings on August 20, 2021, which included the following: "Speech: Normal; TP/TC [Thought process/Thought content]: linear, normal; I/J [Insight/Judgment]: good," and his findings in September and November 2021 and January 2022, which include the following: "Patient is well groomed, speech normal, affect dysphoric and anxious, thoughts linear and no evidence of psychosis, no SI, I/J good." *Id.* (citing AR 1783, 1803, 1833, 1846).

While these findings are part of the record, Unum appears to cherry-pick evidence from those records in a way that does not provide the full scope of Schwartz's condition. LCSW Rohlfing's records show that before Schwartz left work in August of 2020, she was anxious, sad, and depressed. AR 833-34, 836-37, 838-39, 841. She had "catastrophic thoughts and self-doubt." AR 834. Just prior to her last day of work, she felt "overwhelmed and anxious," "overwhelmed" with her choices, and was "anxious, sad." AR 842. During her break from work in 2020, Schwartz was "agitated," "anxious," "depressed," AR 844-45, and suffered from "a catastrophic thinking pattern." AR 850. She felt "sad, lonely and overwhelmed" and was "ashamed and embarrassed about not having found a new living situation, as things are 'falling apart.'" AR 852. Schwartz stated she was "improving" in October of 2020, but she was still "anxious and tearful,"

1    and was specifically anxious about returning to work and "managing her tasks and lack

2    supervision on a very ambitious team." AR 855. In November she was anxious and

3    "overwhelmed with fear." AR 859. She worried that returning to work would result in "being

4    overwhelmed with demands, and was tearful thinking she should just leave her job." AR 863.

5          When Schwartz returned to Workday part-time in January 2021, LCSW Rohlfing's notes

6    show she felt "she needs to be a 'perfect employee' and to fit in with culture of 'working non-stop'

7    and yet knows she can't do this." AR 872. She had "catastrophic thoughts of being fired." *Id.*

8    After one week she was "overwhelmed," depressed, tearful, with more "catastrophic thoughts."

9    AR 873. Schwartz continued to be "overwhelmed" in February, and her boss limited her work to

10   only one project. AR 876, 879. She found this "easier" but was "overwhelmed by guilt" and

11   continued to be tearful in her sessions. AR 877. By early March of 2021, Schwartz was

12   depressed, found her psychiatrist visit "overwhelming," and was "doing easiest tasks at work," but

13   even that "feels like major effort." AR 882. Schwartz did not want to take disability leave

14   because "her ego gets in the way," but "her boss has suggested that she might want to" given her

15   struggles. She remained tearful and depressed and was "concerned about her memory and

16   difficulty 'putting together sentences' due to her depression." She "asks herself 'what does giving

17   up look like?'" AR 883. As a result, Schwartz left work again in March of 2021. During this

18   period, the record shows Schwartz felt better at times, was able to exercise, and visited her family

19   in San Diego. AR 895, 899. However, LCSW Rohlfing's notes consistently described Schwartz's

20   condition as "depressed" (AR 884, 886, 888, 892-93, 897, 900), "dysphoric" (AR 890, 894, 907),

21   and "anxious" (AR 896, 899, 902, 904, 905-06, 908, 910). On occasion, LCSW Rohlfing

22   described Schwartz as "variably impaired." AR 888, 897.

23         When Schwartz made a final attempt to return to work in August 2021, LCSW Rohlfing

24   noted she was "overwhelmed with anxiety and desire to retreat to bed as she contemplates return

25   to work," and was tearful. AR 907. She was "very depressed and anxious," and had "self-critical

26   thoughts that 'something's wrong with me.'" AR 908. After failing her technical writing test,

27   Schwartz remained depressed (AR 913-15, 917, 920), overwhelmed (AR 915), and dysphoric (AR

28   921). She "has thoughts that 'nothing is going to work' and 'I have no support.'" AR 921. She

United States District Court
Northern District of California

22

1    continued to have "catastrophic thinking."  AR 923.

2         While Unum contends Schwartz was not as impaired as she represented, the

3    contemporaneous records show she was consistently depressed, anxious, tearful, overwhelmed,

4    and suffered from catastrophic thinking.  Schwartz may have had some bright moments during this

5    period, but they were not characteristic of her overall condition.  Unum cannot credibly point to

6    them as evidence that she was able to return to work.  *See Waldron v. Unum Life Ins. Co. of Am.*,

7    __ F. Supp. 3d __, 2025 WL 949028, at *17 (W.D. Wash. Mar. 28, 2025) ("Courts have

8    repeatedly held that patients who suffer chronic conditions may improve, but given the temporary

9    nature of those good days, these swings do not materially alter their ability to work."); *Punzio v.*

10   *Astrue*, 630 F.3d 704, 710 (7th Cir. 2011) (even if plaintiff "enjoys a few 'good days,'" that

11   evidence does not support a "finding that her mental illness does not prevent her from holding a

12   job"); *Macalou*, 2024 WL 4867091, at *18 ("It is true that at various points throughout

13   [plaintiff's] treatment her mental status exams produced some normal results. . . .  But these

14   results only paint a partial picture.").

15        Unum also points to Schwartz's work for Mothership as disproving her claim.  Def.'s Mot.

16   at 8-9.  However, Unum does not offer any comparison between Schwartz's duties as a member of

17   a community nonprofit board and her full-time position at Workday.  As Schwartz explained:

18              Currently, I do one monthly administrative meeting . . . and it takes
             me several days to recover. This is with two to four other people who
19              are very friendly and they are all volunteers. It's a very lowstake
             environment and everyone is forgiving and not looking at my work
20              closely. I take care of some accounting and admin tasks for the
             nonprofit group, and it takes me hours to do very simple tasks like
21              recording transactions and reconciling the bank statement. I
             procrastinate and avoid doing these things at an extreme level and
22              weeks often go by without touching the accounting, whereas I should
             be doing a little every week.
23
                In contrast to the above scenario, in my job prior to disability, I was
24              taking care of considerably more difficult financial and budgeting
             projects daily, was confident to meet deadlines and regularly
25              exceeded expectations.

26   AR 82.

27        Unum notes that Schwartz referred to her activities at Mothership as "work" in her

28   sessions with LCSW Rohlfing.  Def.'s Mot. at 9.  But a review of the record shows Schwartz used

1    the word "work" in the colloquial sense of performing duties for the nonprofit, not in the sense of

2    full-time employment.  Further, LCSW Rohlfing's notes show that the limited activities Schwartz

3    performed at Mothership were difficult and tiring.  *See, e.g.*, AR 967 ("sometimes naps or gets

4    little work done there"), AR 979 ("Had successful meeting at her workplace, but felt exhausted

5    from managing people's ideas and expectations"), AR 980 (fatigued and inactive from

6    participating in a meeting that took place a week prior), AR 982 ("concerned about getting work

7    done").

8            Unum argues Schwartz "lied" to vocational consultant Ashley Johnson about her work at

9    Mothership because her comment to Ms. Johnson that she had been doing "0 to 5 hours" per week

10   of "part-time unpaid work" for Mothership "over the past few months" conflicts with her

11   comments to LCSW Rohlfing that she was "going to the office most days" and "attending 2-6

12   meetings a week."  Def.'s Mot. at 14 (quoting AR 821, 965, 967, 3604).  However, Schwartz's

13   discussion with Ms. Johnson took place in November of 2023, AR 3599, long after her comments

14   to LCSW Rohlfing in the summer and fall of 2022, AR 965, 967, 821.  There is no discrepancy;

15   the record simply shows that the degree of Schwartz's participation at Mothership decreased over

16   time.  In comparison, in her position as an Experience Marketing Operations Manager, Schwartz

17   was required to be "flexible in a fast-paced setting with competing and ever-changing tasks," and

18   "drive deadlines."  AR 1652.  Workday required her to be a "[r]esourceful, self-starter that works

19   best in a team environment," with "strong communication skills" and "high levels of tact and

20   diplomacy."  AR 1653.  Requirements like these presented a low bar for Schwartz's disability

21   claim.  *See Lesser v. Reliance Standard Life Ins. Co.*, 385 F. Supp. 3d 1356, 1372 (N.D. Ga. 2019)

22   ("Even a 'mild' impairment to executive functioning could prevent someone from performing a

23   cognitively demanding job."); *Schwarzwaelder v. Merrill Lynch & Co.*, 606 F. Supp. 2d 546, 567

24   (W.D. Pa. 2009) ("Given the very demanding nature of her job duties and the combined demands

25   made by these duties it would not have taken much in the way of impairment for [plaintiff] to be

26   considered disabled under [the Plan]").

27           Unum also argues Schwartz contradicts herself in her representation that "[f]rom April to

28   July 2021 . . . I barely spent time with my family [and] did not exercise and left the house one to

United States District Court
Northern District of California

United States District Court
Northern District of California

two times a week." Def.'s Mot. at 6 (quoting AR 79). It points to LCSW Rohlfing's notes dated June 9 and 16, 2021, when Schwartz told her she was "on vacation with family, visiting parents and siblings' family in San Diego," and "having a good visit with family" in San Diego, AR 899-900; Schwartz's June 18, 2021 email to her primary care physician: "we're on vacation in San Diego," AR 1237; and LCSW Rohlfing's notes dated July 14 and 21, 2021, when Schwartz said she "has been using her exercise bike, which she doesn't mind since she's watching tv and feels good she's doing it," and also said she "feels good about being more involved in parenting and increase in exercise," AR 902-03. However, disability "does not signify an absolute state of helplessness." *Argenal v. Reassure Am. Life Ins. Co.*, 2014 WL 1678008, at *3 (N.D. Cal. Apr. 28, 2014); *Wright v. Colvin*, 2015 WL 1649010, at *14 (D. Vt. Apr. 14, 2015) ("a claimant need not be an invalid, incapable of performing any daily activities, in order to receive disability benefits"). Just because a person can exercise, socialize, travel, volunteer, or even perform part-time work in another field does not mean she is disqualified from receiving disability benefits. *See, e.g., Kowalski v. Farella, Braun & Martel, LLP*, 2008 WL 5397511, at *13 (N.D. Cal. Dec. 23, 2008) (plaintiff's exercise and travel "do not demonstrate she was able to perform the important duties of her own occupation"); *Dwyer v. Unum Life Ins. Co. of Am.*, 548 F. Supp. 3d 468, 494 (E.D. Pa. 2021) ("The nature, flexibility, and time-commitments of Plaintiff's other work are distinct from her regular occupation before becoming disabled. Even when working part-time, her job responsibilities have not mirrored those of her regular occupation. Her ability to perform this work has not been consistent and does not undermine her professed disability."); *Kaminski v. Unum Life Ins. of Am.*, 517 F. Supp. 3d 825, 864 (D. Minn. 2021) (ability to drive and travel did not mean plaintiff could return to work); *Bowlin v. Prudential Life Ins. Co. of Am.*, 2018 WL 1441175, at *12 (C.D. Cal. Mar. 22, 2018) (same). And, as discussed above, during this same period, LCSW Rohlfing's notes consistently described Schwartz's condition as depressed, dysphoric, and anxious.

This case is similar to *Bowlin*. There, the plaintiff worked in a high-level financial position but suffered from depression, anxiety, fatigue, panic attacks, and inability to concentrate, among other symptoms. 2018 WL 1441175, at *1, 3-8. Prudential denied her disability claim, finding

the plaintiff was not disabled because she was able to travel, visit with friends, exercise, and perform activities of daily living. *Id.* at *8, 12. The court overturned this denial, explaining that Prudential's "claim review placed too much significance on Plaintiff's ability to care for herself, her reports of socializing with friends and going to the gym, her ability to drive herself, and her travel plans." *Id.* at *12. The court noted that these facts were irrelevant "in the absence of additional information on the frequency, duration, or intensity of the day-to-day activities." *Id.* The court also noted that plaintiff's "activities were known to [her doctor] . . . who nevertheless consistently held the opinion that Plaintiff was unable to perform her job duties during the relevant time period. As noted, [her doctor] had the benefit of talking extensively with Plaintiff and therefore was in a better position to understand both the activities in which Plaintiff engaged and her occupational limitations." *Id.*

Here, the record shows Schwartz worked in a stressful, demanding job, and that she had the full support of her treating providers in submitting her disability claim. These providers were aware of her activities outside of work, and they encouraged her in those activities, but they were nevertheless adamant that these activities did not measure up to the demands of her job at Workday. *See, e.g.*, AR 4096 (LCSW Rohlfing: "Her very limited involvement with a nonprofit Mothership Hackermoms is in no way indicative of her ability to sustain full-time employment."). The central issue is not whether Schwartz was capable of activity, but whether she could perform her job at Workday. The record shows that she could not. *See J.A. v. Saul*, 2021 WL 2822534, at *6 (D. Kan. July 7, 2021) (sporadic ability to work and ability to perform activities of daily living does not mean plaintiff suffering from depression and anxiety could perform a regular job on a sustained basis); *see Miller v. Am. Airlines, Inc.*, 632 F.3d 837, 855 (3d Cir. 2011) ("it is essential that any rational decision to terminate disability benefits under an own-occupation plan consider whether the claimant can actually perform the specific job requirements of a position").

### D.    Treating Providers

Schwartz has been treating with therapist, LCSW Rohlfing, since 2017 and with her psychiatrist, Dr. Van Dyke, since 2015. AR 87, 4096. As a result, both were familiar with her during the entire time period at issue, and no other medical professionals in the record were in a

better position to evaluate her condition.  *See Dwyer*, 548 F. Supp. 3d at 487 ("One advantage of the treating providers is their familiarity with the patient, particularly where they have followed the patient over a sustained period of time.").  Both professionals vouched for Schwartz's disability.  *See* AR 87 (Dr. Van Dyke offering his "professional opinion" that Schwartz "meets criteria for long term disability"); AR 4097 (LCSW Rohlfing: "It is my professional opinion . . that she is unable to return to work in her position of Experience Marketing Operations Manager from October 31, 2021, through present").  LCSW Rohlfing specifically responded to Unum's allegations regarding Schwartz's credibility by stating that she had "known her for several years and she is not a malingerer."  AR 4097.  *See Waldron*, 2025 WL 949028, at \*18 ("none of [plaintiff's] providers have ever even hinted that they thought [plaintiff] was fabricating his symptoms").

Unum argues Schwartz's treating providers cannot be relied upon because they "accepted and repeated her self-reported complaints."  Def.'s Mot. at 20.  It is true that treating providers "have an obligation to record the symptoms complained of by their patients" and "are more or less required to accept the representations of their patients."  *Seleine*, 598 F. Supp. 2d at 1102.  At the same time, insurers "must consider the possibility that applicants are exaggerating in an effort to win benefits (or are sincere hypochondriacs not at serious medical risk)."  *Shaw v. Life Ins. Co. of N. Am.*, 144 F. Supp. 3d 1114, 1128-29 (C.D. Cal. 2015).  However, a "psychological assessment is by necessity based on the patient's report of symptoms and responses to questioning," and thus it is "illogical to dismiss the professional opinion of an examining psychiatrist or psychologist simply because that opinion draws from the claimant's reported symptoms."  *Aurand v. Colvin*, 654 F. App'x 831, 837 (7th Cir. 2016).

Unum also argues Schwartz must submit "objective medical evidence" in support of her disability, Def.'s Mot. at 18, yet there is no "objective evidence" requirement in the Policy, and it is not clear what that would consist of in a case involving mental illness.  *See Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 678 (9th Cir. 2011) ("conditioning an award on the existence of evidence that cannot exist is arbitrary and capricious"); *Sanchez v. Apfel*, 85 F. Supp. 2d 986, 992 (C.D. Cal. 2000) ("Courts have recognized that a psychiatric impairment is not as

United States District Court
Northern District of California

1    readily amenable to substantiation by objective laboratory testing as is a medical impairment.");

2    *Bowlin*, 2018 WL 1441175, at *13 ("a claimant cannot be faulted [for] failing to provide objective

3    evidence regarding symptomology that is inherently subjective"); *Jamie F. v. UnitedHealthcare*

4    *Ins. Co.*, 474 F. Supp. 3d 1052, 1062 (N.D. Cal. 2020) (cases involving mental illness have "no

5    objective imaging or laboratory tests on which diagnoses are based" and thus "[c]ourts generally

6    give greater weight to doctors who have examined the claimant versus those who only review the

7    file").  To the extent Unum contends that the "objective evidence" Schwartz is required to provide

8    consists of medical records that support her claim, those exist here, as she consistently treated with

9    both her therapist and her psychiatrist for several years.

10        Unum argues these treatment notes are insufficient because they document "normal mental

11    status examinations," that Schwartz's "cognitive functioning" was "oriented/alert," and that her

12    functional status was "intact."  Def.'s Mot. at 7, 18, 22.  As to LCSW Rohlfing, Unum notes she

13    consistently documented (in the "Observations" section of her treatment notes) that Schwartz's

14    cognitive, social and functional capacity were normal/unimpaired.  *Id.* at 18-19 (citing AR 815-22,

15    917-86).  As to Dr. Van Dyke, Unum notes he repeatedly documented normal mental status exams

16    findings (normal speech, linear thoughts) and intact cognitive functioning.  *Id.* at 18 (citing AR

17    1803, 1833, 1846, 1862-63).  Even accepting its characterization of Schwartz's doctors' findings,

18    however, it does not necessarily follow that they are inconsistent with disability.  A patient can

19    simultaneously function on a basic level and participate meaningfully in therapy by being

20    "oriented" and "alert," yet still lack the ability the perform the duties of a stressful full-time job.

21    *See Barrett v. Comm'r of Soc. Sec.*, 2024 WL 209431, at *6 (W.D.N.C. Jan. 19, 2024) ("[T]he fact

22    that Ms. Barrett appeared 'alert' when she visited her doctors and exhibited fair judgment, etc.

23    during those examinations (while still complaining of anxiety) is not inconsistent with the

24    conclusion that she has mental limitations that must be taken into account."); *Testamark v.*

25    *Berryhill*, 736 F. App'x 395, 398-99 (4th Cir. 2018) ("[T]he fact that [plaintiff] exhibited fair

26    judgment or appeared cooperative on certain specific occasions is not inconsistent with the

27    conclusion that she is unable to work.").  Indeed, one can still suffer from "debilitating mental

28    illness" even if one is "wellgroomed" with "normal speech," has "fair to good" judgment, and is

United States District Court
Northern District of California

28

"cooperative" with treatment. *Ortiz v. Comm'r of Soc. Sec.*, 2021 WL 4452793, at *7 (M.D. Fla. Sept. 29, 2021); *see also McDonald v. Kijakazi*, 2021 WL 4237614, at *6 (M.D. Fla. Sept. 17, 2021) (doctor's treatment notes "indicating Plaintiff was at times 'normal,' without more, cannot constitute good cause to reject" the doctor's opinions); *MacGregor v. Bowen*, 786 F.2d 1050, 1053-54 (11th Cir. 1986) (superseded on other grounds by regulation) (fact that plaintiff was "intelligent enough to understand and follow orders and to solve problems" was not inconsistent with depression diagnosis; "We see no inconsistency whatever and are almost embarrassed to remind the appeals council that highly intelligent and able people do fall prey to crippling depression."). The Court also notes that one would expect a patient to perform better in the environment of a therapist's office than in the more challenging setting of the workplace. *See Simon v. Comm'r, Soc. Sec. Admin.*, 7 F.4th 1094, 1107 (11th Cir. 2021) (superseded on other grounds by regulation) (factfinder must consider "the fundamental differences between the relaxed, controlled setting of a medical clinic and the more stressful environment of the workplace"); *Morales v. Apfel*, 225 F.3d 310, 319 (3d Cir. 2000)) (for mental illness patients, "the work environment is completely different from home or a mental health clinic"). As a result, the comments in Schwartz's medical records that she was "oriented," "alert" and "functional" during her medical visits do not somehow translate into a conclusion that she could return to her job. The Court therefore credits LCSW Rohlfing's and Dr. Van Dyke's opinions.

As to Dr. Chambers and Dr. Jacks, Unum contends their testing should be disregarded because of invalidity concerns. Def.'s Mot. at 15-16, 19, 23. However, as discussed further below, the Court does not rely on these opinions to establish any disability, but it does find the testing Schwartz underwent is still probative to the extent it supports the opinions of LCSW Rohlfing and Dr. Van Dyke. Based on his neuropsychological evaluation in July and August 2021, Dr. Chambers found "severe impairment" in sustained attention, impaired motor coordination and speed, and "appreciable distress from uncontrolled mental health concerns," AR 629, 631. Dr. Chambers stated Schwartz suffered from "dysfunctional thinking" and "interpersonal issues" which included "social avoidance and social anxiety." AR 631. Dr. Chambers found Schwartz "diagnostically complex," and noted "some clinical correlation with an

ASD [Autism Spectrum Disorder], pronounced double depression, and Cluster C personality malformation." *Id*. In his letter to Unum, Dr. Chambers stated, "There was no overt evidence of neurocognitive malingering during my exam," and it was his "opinion that her uncontrolled psychiatric symptoms caused her substantial impairments, and the aberrant neuropsychological scores from my examination reflected the magnitude of her disability status at the time of the exam and for at least another year, based on my review of records, informant reports, my knowledge of her state at the exam's conclusion, and her updated contact with me about the course of her mental illness." AR 4056. As for Dr. Jacks, his October 2023 examination revealed "extremely severe depression" which was causing "moderate-to-severe emotional distress characterized by dysphoria, guilt, and anxiety." AR-3981, 3986. He observed Schwartz had "extreme difficulty" with social interactions, could not "understand ordinary social cues," and had problems "communicating with others or understanding visual social interactions beyond those of simple ones." AR 3992. Dr. Jacks concluded that Schwartz was "extremely distressed and has serious psychiatric problems" and could not return to work in "any position" because of her "extreme difficulty" with social interactions and cognitive problems. *Id*. These findings provide further support for LCSW Rohlfing's and Dr. Van Dyke's credible opinions.

## E.    Unum's Medical Consultants

"[C]onsulting physicians' opinions based on reviews of medical records are an acceptable basis of an administrator's determination." *Broyles v. A.U.L. Corp. Long–Term Disability Ins. Plan*, 2009 WL 3817935, *6 (N.D. Cal. 2009), *aff'd*, 408 F. App'x 67 (9th Cir. 2011) (citing *Jordan v. Northrop Grumman Corp.*, 370 F.3d 869, 879-80 (9th Cir. 2004)).

Unum argues the opinions of its medical consultants are entitled to "significant weight." Def.'s Mot. at 22. It notes "[t]he medical experts who reviewed the file information at Unum's request acknowledged Schwartz's history of depression and anxiety and her subjective complaints. However, they each independently confirmed that Schwartz's behavioral health and cognitive complaints do not rise to a level that would preclude her from performing her occupational duties on a full-time basis." *Id*. Unum cites to the following portions of their findings:

Dr. Shipko noted that it was "inconsistent with disabling depression

that therapy records with Ms. Rolfing reflect that beyond 10/31/21 functionality is intact, and mood is euthymic," and that "beyond 3/15/22 treatment attenuates from monthly to a two-month interval and then there is a 5-month interval between visits in 5/22 and 10/22." AR 3110.

Dr. Brown noted that Schwartz's "[m]ental status examinations and symptoms self-report were substantively unchanged," and there was "no report of impairment in any activities that the claimant chose to perform." AR 4014. The records were "not consistent with severe and sustained psychiatric impairment during the timeframe in question with regard to symptom intensity, related functional impairment, abnormal mental status examinations or treatment intensity." AR 4014-15.

Dr. Spica noted that "Dr. Chambers' testing demonstrated that the claimant does not exhibit converging or consistent evidence of neurocognitive dysfunction rising to the level of impairment in any domain," and Schwartz's February 2023 neuropsychological exam with "non-psychologist" Dr. Jacks "appears invalid, as performance validity indicators [assessing the extent to which an examinee is putting forth full effort on neurocognitive testing] were reportedly subnormal." AR 4067, 4068.

*Id.* at 23.

As to Dr. Shipko's comment that "therapy records with Ms. Rolfing [sic] reflect that beyond 10/31/21 . . . mood is euthymic," it does not match the record. LCSW Rohlfing's treatment notes showed that on some visits Schwartz was euthymic, but on many others she was anxious (AR 923, 935, 937-40, 950, 951, 959, 971, 973, 976), depressed (AR 930, 932, 949, 962, 967, 979), or dysphoric (AR 982, 983). As to Dr. Shipko's finding regarding the frequency of Schwartz's treatments, Schwartz admits "her appointments with Dr. Van Dyke were less regular after she stopped working." Pl.'s Opp'n at 14. However, she "continued without change her weekly sessions with her primary point of contact, Ms. Rohlfing." *Id.* (citing AR 921-83). While Unum seems to argue Schwartz could have returned to her job because her condition improved once she stopped working, a more logical conclusion is that her job was worsening her condition and a return would have undermined any improvement she had made. Indeed, the record shows just that on the two occasions when she tried to return to work. *See Messing v. Provident Life & Accident Ins. Co.*, 48 F.4th 670, 681 (6th Cir. 2022) ("True, the reports and affidavits repeatedly suggest that [plaintiff's] mental health has been improving since he stopped working. . . . But improvements in [plaintiff's] health do not necessarily mean he can return to working [] full-

United States District Court
Northern District of California

1    time"); *Cunningham v. Paul Revere Life Ins. Co.*, 235 F. Supp. 2d 746, 756 (W.D. Mich. 2002)

2    (insurer's doctor "completely ignores the fact that Plaintiff only became clinically stable when he

3    was away from the stresses of his occupation").

4          As to Dr. Brown's finding that Schwartz's treatment records were "not consistent with

5    severe and sustained psychiatric impairment during the timeframe in question," he also found

6    evidence of "a chronic complex psychiatric condition." AR 4014, 4071. Dr. Brown also agreed

7    there was "evidence of continuous treatment for this chronic condition," AR 4071, and

8    acknowledged Schwartz's statement that "her condition has frequently been exacerbated by the

9    stress of work responsibilities, resulting in burnout and resulting in an inability to sustain full-time

10   functional capacity on a regular basis." AR 4014. While Dr. Brown opined that "situational

11   factors predominate," *id.*, the record shows the psychological and social symptoms Schwartz

12   experienced were not limited to work. *See, e.g.*, AR 78-80 (Schwartz had an "extreme inability to

13   communicate with my husband," could not participate in childcare, and left her home for a few

14   days). Schwartz's symptoms also persisted even when she was on leave from work. From August

15   through December of 2020 – when she was not working – Schwartz could not communicate with

16   her family, "stayed in bed the vast majority of the day," her "thoughts become more catastrophic

17   and filled with anxiety," and she "could not hold thoughts in my head." AR 79. From March

18   through August of 2021 – again, when she was not working – Schwartz "cried constantly and was

19   close to suicidal," "barely spent time with my family," "felt enraged and sad all the time," and

20   "left the house one to two times a week." *Id.* Indeed, even after Schwartz stopped working at

21   Workday for good in October of 2021, she was still "near-suicidal," "thought about walking in

22   front of cars," "was sad, crying, and disappointed constantly," could not drive due to "extreme fear

23   and anxiety," and was "barely able to focus." AR 80. In short, while work stress undoubtedly did

24   not help Schwartz, any improvements in her health do not establish she could return to working

25   full time.

26         As for Schwartz's psychological testing, Dr. Brown rejected it as "invalid with a pattern

27   consistent with florid symptom exaggeration." AR 4071. But as Dr. Chambers informed Unum,

28   "[t]here was no overt evidence of neurocognitive malingering" in his testing, and any deviations

were due to Schwartz's "uncontrolled psychiatric symptoms" which "reflected the magnitude of her disability status." AR 4056. Likewise, Dr. Jacks identified similar deviances in his testing but opined that it reflected "extreme emotional distress" and "serious extensive psychological problems." AR 3980, 3987. Indeed, even Dr. Spica conceded that although he did not consider Dr. Chambers' testing valid as a neurocognitive measurement, the results might be explained by Schwartz's poor mental health. AR-4068 ("the claimant's psychological factors may be influencing her experience of cognitive dysfunction," especially given her "history of depression, anxiety, and Borderline Personality Disorder"). There is also no other evidence in the record to support the conclusion that Schwartz was malingering or somehow manufacturing her condition. She received treatment from LCSW Rohlfing and Dr. Van Dyke for many years, predating and throughout her disability. *See Meyer v. Unum Life Ins. Co. of Am.*, 2021 WL 1102443, at *18 (C.D. Cal. Mar. 23, 2021) (giving "great weight" to the opinions of plaintiff's physicians because they treated him on an ongoing basis, both before and after his disability). As explained above, both providers supported her disability claim, and LCSW Rohlfing specifically informed Unum that she knew Schwartz well and "she is not a malingerer." AR 4097. *See Haag v. Unum Life Ins. Co. of Am.*, 2023 WL 6960369, at *10 (N.D. Cal. Oct. 20, 2023) (plaintiff's claim supported by her doctors, who stated she was "trustworthy" and "did not indicate any credibility concerns").

Schwartz's own history and conduct supports the conclusion that she is not simply trying to avoid working. She has a bachelor's degree and an MBA, has consistently worked in marketing and program management, and states that she enjoyed working at all her jobs, including Workday. *See* AR 77, 85 (statement from Schwartz that she "always wanted to work and build a career," was "very excited about working" at Workday, took minimal time off "because she wanted to be back at work" and "would certainly want to work if she were medically able"). She also tried to return to Workday on two separate occasions despite her symptoms, attended treatment in an effort to improve her condition, and tried several different medications, some with negative side effects. AR 80. *See Haag*, 2023 WL 6960369, at *10 (consistency of treatment, taking medication with side effects, and attempts to return to work supported plaintiff's credibility); *Demer v. IBM Corp. LTD Plan*, 835 F.3d 893, 905 (9th Cir. 2016) (plaintiff should be believed if the insurer has no

33

1    basis for rejecting credibility).

2        Unum also cites to Dr. Brown's opinion in which he notes that "[a]part from a trial of TMS

3    that was discontinued because of possible side effects the only changes in her treatment regimen

4    was the discontinuation of hypnotic and mood stabilizing medications." Def.'s Mot. at 14

5    (quoting AR 4014). Unum notes that this finding is backed up by Dr. Van Dyke's March 2022

6    note which documented that Schwartz had discontinued her psychiatric medication (Latuda) and

7    non-medication treatment (TMS) and "report[ed] an improvement in her mildly depressed mood

8    and no further internal restlessness." *Id*. at 22 (citing AR 1873). As to her medications, Schwartz

9    has explained that she tried many medications but most either did not work or caused unpleasant

10   side effects. *See* AR 80, 1833, 1863 (Latuda caused extreme anxiety, among other symptoms, and

11   Nortriptyline caused severe constipation). Schwartz cannot be faulted for not taking medication

12   when it either did not work or caused her active harm. *See Wright*, 2015 WL 1649010, at *14

13   (plaintiff stopped taking medication "because he has had negative side effects . . . and thus

14   reasonably fears additional side effects").[7]

15       As to Dr. Spica's finding that the testing by Dr. Chambers and Dr. Jacks should be

16   disregarded because of invalidity concerns, Schwartz admits both doctors "recorded atypical

17   responses during their evaluations," but she "does not contend that this testing is essential for her

18   to prevail. Pl.'s Opp'n at 14. The Court notes that neither doctor concluded that these responses

19   were evidence of malingering. Instead, both concluded that the responses were the product of

20   Schwartz's emotional distress. *See* AR 629 (deviations were "due to appreciable distress from

21   uncontrolled mental health concerns"), AR 632 ("anxiety and depression are so pronounced, that

22   they are likely causing her variable presentation of attentional and intermittent cognitive

23   dysfunction"), AR 3980, 3987 (atypical responses did "not indicate conscious distortion or

24   overstatement of the psychological symptoms" and "is not malingering," but rather "indicates

25

26   ───────────────

27   [7] The Court also notes Dr. Brown did not examine Schwartz, yet he has "testified that in his own treatment of patients, he would never 'render an opinion . . . without having met with him or her in person.'" *Dwyer*, 548 F. Supp. 3d at 484; *see also Wessberg v. Unum Life Ins. Co. of Am.*, 2024 WL 3444044, at *9 (D. Minn. July 15, 2024) (noting Dr. Brown had not treated a patient in more than a decade and did not speak to or examine the plaintiff before deciding she was not disabled).

28

United States District Court
Northern District of California

1    moderate to severe emotional distress").  Thus, even if the testing was found to be invalid, it still

2    provides insight into Schwartz's mental condition.  Indeed, even Dr. Spica conceded that although

3    he did not consider Dr. Chambers' testing valid as a neurocognitive measurement, the results

4    might be explained by Schwartz's poor mental health.  AR 4068 ("[T]he claimant's psychological

5    factors may be influencing her experience of cognitive dysfunction," especially given her "history

6    of depression, anxiety, and Borderline Personality Disorder.").  Accordingly, while the Court does

7    not rely on these opinions to establish any disability, it does find the testing Schwartz underwent is

8    still probative.

9         Finally, while ERISA does not accord special deference to the opinions of a treating

10   physician, *Black & Decker Disability Plan*, 538 U.S. at 831, courts generally give greater weight

11   to doctors who have examined the claimant versus those who only reviewed the file.  *See*

12   *Salomaa*, 642 F.3d at 676; *Filarsky v. Life Ins. Co. of N. Am.*, 391 F. Supp. 3d 928, 942 (N.D. Cal.

13   2019) ("While deference is not necessarily owed to treating physicians in ERISA cases,

14   conclusions drawn at the end of in-person medical examinations are inherently more helpful

15   because the treating physician observes and interacts with the patient for several minutes at a

16   time."); *Heinrich v. Prudential Ins. Co. of Am.*, 2005 WL 1868179, at *8 (N.D. Cal. July 29, 2005)

17   (failure of administrator's physicians to examine claimant entitles their opinions to less weight

18   than treating physicians since the nature of the condition at issue produces symptoms that must be

19   evaluated through in-person examination).  If Unum had serious concerns about the validity of

20   Schwartz's condition, it could have arranged for an interview or examination, as provided for in

21   the Policy.  AR 4237 ("The insurer at its own expense shall have the right and opportunity to

22   examine the person of any individual whose injury or sickness is the basis of claim when and as

23   often as it may reasonably require during the pendency of a claim hereunder.").  However, Unum

24   never exercised this right, which raises doubts about the quality of its decision.  *See Calvert v.*

25   *Firstar Fin., Inc.*, 409 F.3d 286, 295 (6th Cir. 2005) (failure to conduct an examination,

26   "especially where the right to do so is specifically reserved in the plan," can "raise questions about

27   the thoroughness and accuracy of the benefits determination").

28        In sum, the Court finds the opinions of Unum's physicians, who never treated, examined,

United States District Court
Northern District of California

1    or even spoke with Schwartz, are entitled to less weight than that of Dr. Van Dyke, who has

2    treated Schwartz since 2015, and LCSW Rohlfing, who has treated her since 2017, and were in the

3    best position to evaluate her condition.  Their opinions are supported by the reports of Dr.

4    Chambers and Dr. Jacks, and all four opined that Schwartz was in no condition to return to her job

5    at Workday.  *See, e.g., Macalou*, 2024 WL 4867091, at *14 (emphasizing "the 'length and nature'

6    of [plaintiff's] relationships with her treating providers" and the fact that "none of First Unum's

7    file reviewers treated, examined, or spoke to [plaintiff] prior to the initial claim denial or during

8    her appeal"); *Shaw*, 144 F. Supp. 3d at 1129-30 ("Courts have typically afforded greater weight to

9    the opinions of physicians who have treated the claimant for an allegedly disabling condition for a

10   long period of time," and to "doctors whose specialty relates to the alleged disability.") (collecting

11   cases); *Westphal v. Eastman Kodak Co.*, 2006 WL 1720380, at *5 (W.D.N.Y. June 21, 2006)

12   ("There can be no serious doubt that a psychiatric opinion based on a face-to-face interview with

13   the patient is more reliable than an opinion based on a review of a cold, medical record.");

14   *Sheehan v. Metro. Life Ins. Co.*, 368 F. Supp. 2d 228, 254 (S.D.N.Y. 2005) ("Courts routinely

15   discount or entirely disregard the opinions of psychiatrists who had not examined the individual in

16   question at all or for only a limited time."); *Winkler v. Metro. Life Ins. Co.*, 170 Fed. App'x 167,

17   168 (2d Cir. 2006) ("First-hand observation is especially important in the context of assessing

18   psychiatric disabilities").

19                                    **V.    CONCLUSION**

20            The Court finds Schwartz has shown by a preponderance of the evidence that she is

21   disabled within the meaning of the Policy and that Unum erroneously denied her claim.  For the

22   reasons stated above, the Court **GRANTS** Schwartz's motion for judgment and **DENIES** Unum's

23   cross-motion.  Unum is therefore **ORDERED** to pay benefits under the Policy for the two-year

24   mental disorder benefit period.

25            The Court also finds Schwartz has achieved "some success on the merits" under *Hardt v.*

26   *Reliance Standard Life Ins. Co*., 560 U.S. 242, 255 (2010), and is eligible to apply for a reasonable

27   award of non-taxable costs and attorney's fees under ERISA.  *See* 29 U.S.C. § 1132(g).  Pursuant

28   to Civil Local Rule 54-5, counsel "must meet and confer for the purpose of resolving all disputed

United States District Court
Northern District of California

issues relating to attorney's fees before making a motion for award of attorney's fees." If the
parties are unable to mutually agree as to the proper calculation of those amounts, any calculation
of benefits, costs, and/or fees shall be determined by post-hearing briefing pursuant to the schedule
under Local Rule 54-5, unless the parties stipulate to enlarge time under Local Rule 6-2.

**IT IS SO ORDERED.**

Dated: July 1, 2025

THOMAS S. HIXSON
United States Magistrate Judge

United States District Court
Northern District of California